RECEIVED
IN LAKE CHARLES, LA.

APR 29 2013

TONY R. MOORE, CLERK
BY_____
                    DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

CARMEN MALBROUGH, ET AL.        :        DOCKET NO. 2:11 CV 1842

VS.                             :        JUDGE MINALDI

KANAWHA INSURANCE CO., ET AL. : 	MAGISTRATE JUDGE KAY


## MEMORANDUM RULING

Before the court is a Motion for Summary Judgment [Doc. 24], filed by the defendant, Kanawha Insurance Company ("Kanawha"). The motion is opposed by the plaintiffs, Carmen Malbrough and Lionel Simon [Docs. 30, 35]. Kanawha then filed a Reply [Doc. 37]. Also before the court is a Motion to Continue Kanawha's Motion for Summary Judgment and Allow Discovery [Doc. 27], filed by the plaintiffs, which is opposed by Kanawha [Doc. 33]. For the reasons stated herein, the plaintiff's Motion to Continue Kanawha's Motion for Summary Judgment and Allow Discovery is GRANTED and Kanawha's Motion for Summary Judgment is DENIED as premature. The defendants may file a renewed Motion for Summary Judgment after the plaintiffs have been given the chance to conduct discovery.

## FACTUAL BACKGROUND

This lawsuit arises out of the denial of life and accidental death insurance benefits allegedly due to the plaintiffs as beneficiaries of an insurance policy insuring the late Ronald Simon.

1

Mr. Simon was provided life insurance through a Group Term Life Insurance Policy ("the Policy") issued to his employer, Gilchrist Construction Company, by Kanawha Insurance Company.[1]  Under the Policy, Gilchrist is the policyholder, plan administrator, and fiduciary, and employees (such as Mr. Simon) are listed as "covered persons" or "insureds."[2]  Pursuant to the Policy, Gilchrist allegedly provided employees with "Certificates of Group Term Life Insurance for Class I All Eligible and Active Full Time Hourly Employees of Gilchrist Construction Company" (essentially, the plan summary documents),[3] although the plaintiffs contest that there is no evidence Mr. Simon ever received this information.[4]

According to both the Policy documents and the Certificate, the maximum combined basic and supplemental group life insurance available under an employee's policy could not exceed five times their basic annual earnings.[5]  The documents provide the same limits for accidental death and dismemberment benefits.[6]  As Mr. Simon earned roughly $30,000 a year, therefore, the maximum basic and supplemental group life insurance he could receive was $150,000, and the maximum death and dismemberment benefits he could receive was $150,000 (or, $300,000 total).[7]

---

[1] Kanawha's Statement of Uncontested Facts to Mot. for Summ. J., [Doc. 24-5], at ¶ 2; Plaintiffs' Statement of Material Facts to Opp. to Mot. for Summ. J., [Doc. 30-2], at ¶ 2.

[2] "The Policy," Ex. A to Kanawha's Mot. for Summ. J., [Doc. 24-3] at p. 4.

[3] [Doc. 24-5] at ¶ 5.

[4] [Doc. 30-2] at ¶ 27.

[5] [Doc. 24-3] at pp. 6 –11.

[6] *Id.*

[7] [Doc. 30-2] at ¶ 16.

While Kanawha determined the premiums, Gilchrist was delegated the responsibility of furnishing information on premiums, distributing applications for coverage, transmitting Certificates to employees, calculating the premium amount for employees covered under the Policy, and withholding the appropriate amount of premiums from the employees' pay.[8] According to Kanawha, each month, Gilchrist would write a check to Kanawha for the entire amount of the premiums from all of the employees to pay Kanawha for the entire Policy.[9]

Related to Gilchrist's administrative responsibilities, Gilchrist was responsible for setting up a website through which Gilchrist employees could purchase coverage.[10] The plaintiffs aver an error on Gilchrist's website permitted Mr. Simon to purport to elect $350,000 of basic life insurance and $350,000 of accidental death insurance ($700,000 total), despite the fact that Mr. Simon was technically only allowed to elect $300,000 total.[11]  Gilchrist deducted the premiums for that amount of insurance from his paycheck from the day he purchased coverage until his death, which occurred roughly a year later.[12]

Mr. Simon died on December 21, 2010 from injuries he sustained in a work-related accident.[13] After Mr. Simon's death, the plaintiffs filed claims as the named beneficiaries under his life and accidental death insurance policies.[14] Kanawha directly paid each of the plaintiffs

---

[8] [Doc. 24-5] at ¶ 10.

[9] Aff. of Brian Walter, Ex. 1 to Def.'s Mot. for Summ. J., [Doc. 24-2], at p. 4.

[10] [Doc. 30-2] at ¶ 16, 19.

[11] *Id.*

[12] *Id.* at ¶ 22.

[13] *Id.* at ¶ 24.

[14] *Id.* at ¶ 32.

$150,000 in benefits in February 2011, for a total of $300,000.[15]   However, Kanawha refused to

pay the full $700,000 of coverage which Mr. Simon had attempted to elect for accidental death

insurance and life insurance, because that amount exceeded the maximum coverage available to

him under the terms of the Policy.[16]

On September 15, 2011, the plaintiffs filed this lawsuit against Gilchrist and Kanawha in

the 31st Judicial District Court for Jefferson Davis Parish, Louisiana to recoup the difference

between what they were paid and what they would have been paid under the $700,000 policy

allegedly promised to Mr. Simon by Gilchrist and Kanawha, plus attorney's fees, legal interest,

and any other legal remedies available.[17]  In their petition, they based their claims against the

defendants on the theories of ratification (i.e., because the defendants failed to recognize their

error during Mr. Simon's lifetime, they "ratified" the contract and owe the full $700,000) and

detrimental reliance (i.e., Ronald Simon relied to his detriment on the misleading information on

the Gilchrist website, because he might have shopped elsewhere for insurance if he knew his

benefit amounts were so low)[18]

---

[15] *Id.* at ¶ 34.  There is some discrepancy between the amount of money the plaintiffs allege they were paid by
Kanawha in their original petition (only $240,000) versus the amount they allege they were paid in their Statement of
Material Facts ($300,000).  This is explained in a May 17, 2011 letter from Kanawha's attorney: "While Kanawha
voluntarily paid an additional $60,000 in benefits because Gilchrist Construction 'grandfathered' certain employees
with additional life insurance benefits, including Mr. Richard Simon, pursuant to an employment agreement,
Kanawha only did so as a courtesy to Gilchrist Construction.  This additional amount is not provided for in the
Policy." *See* May 17, 2011 Letter from Baker Donelson to Plaintiffs, Ex. to Pl.'s Supp. Opp. to Mot. for Summ. J.,
[Doc. 35-1] at p. 12.

[16] *Id.* at ¶ 36, [Doc. 24-5] at ¶ 10.

[17] State Court Pet., [Doc. 1-1].

[18] *Id.* at ¶¶ 10 – 12.

The defendants then removed the case to this court on the basis of federal question jurisdiction because the case arises under Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*[19]

## LAW & ANALYSIS

In the plaintiffs' Motion to Continue Kanawha's Motion for Summary Judgment and Conduct Discovery, the plaintiffs allege that, while evidence in ERISA cases is usually restricted to the administrative record and discovery is not permitted, here, there was no administrative review and hence no administrative record.  They note that after Kanawha denied their claim for additional benefits above the $300,000 amount, Kanawha never told them where, how, or when to submit evidence in support of their claim to make an administrative record; neither Gilchrist nor Kanawha gave them an opportunity to request evidence; and, the defendants did not respond fully to the requests for information the plaintiffs did make.  They also requested permission from Kanawha to conduct discovery, but this request was denied.

The plaintiffs conclude that it would be unfair for Kanawha to have the benefit of all of its records to support its Motion for Summary Judgment, when the plaintiffs only have an incomplete accounting of what happened, particularly because the person who was insured under the Policy, Mr. Simon, is deceased.  As such, the defendants must provide the plaintiffs with some of the information so that they can have a better understanding of what happened and more fully respond to the pending Motion for Summary Judgment.  The plaintiffs' list of requested information includes the following: (1) the administrative services contract between Gilchrist and the plan administrator for the years 2009-2010; (2) copies of any materials and documents believed to have been supplied to Mr. Simon; (3) copies of any documents or applications

---

[19] Not. of Removal, [Doc. 1].

completed by Mr. Simon; (4) the amount of insurance that corresponds with the premiums paid

by Mr. Simon; (5) who received the premiums; (6) a copy of all applications and forms filled out

by Mr. Simon at any time that pertains to his life insurance policy; (7) proof that Ronald Simon

was provided with a copy of the policy prior to his death; and, (8) information that clearly

demonstrates the source of the funds used by the Plan to make payments to this claim.

In response, Kanawha asserts that an administrative record does exist in this case, and that

Kanawha provided the plaintiffs with many of the documents they sought, but that submission of

the entire administrative file is not necessary absent the issuance of an ERISA Case Order from

this court.  Further, citing to the Fifth Circuit case *Crosby v. Louisiana Health Service and

Indemnity Co.*, 647 F.3d 258 (5th Cir. 2011), Kanawha asserts that discovery in an ERISA case is

limited to issues such as: (1) whether the administrative record is complete; (2) whether the

administrator complied with procedural regulations; and, (3) whether there exists a conflict of

interest created by the administrator's dual role.  Finally, Kanawha notes that discovery would be

futile for the purposes of its Motion for Summary Judgment, since the main information relevant

to that motion the plaintiffs seek is whether Mr. Simon was provided a copy of the Policy.

Kanawha argues, citing an Eastern District of Michigan case (*O'Connor v. Provident Life &

Accident Co.*, 455 F.Supp. 2d 670 (E.D. Mich. 2006)) and a Louisiana Third Circuit case

(*Credeur v. Continental Assurance Co.*, 502 So.2d 214) (La. App. 3 Cir. 1987)), that the errors or

omissions of Gilchrist on its website cannot bind Kanawha, and that the clear terms of the Policy

only allowed Mr. Simon to elect up to $300,000 in benefits.

**A. Scope of Discovery**

Turning to *Crosby*, the court notes that while Kanawha is technically correct that

discovery in ERISA cases can be very limited, the *Crosby* court specifically addressed "the scope

6

of admissible evidence and permissible discovery in an ERISA action to recover benefits under 29 U.S.C. § 1132(a)(1)(B)." *Crosby*, 647 F.3d at 260. In this case, there is an issue of whether the plaintiffs are even seeking relief under this provision of ERISA.

Under § 1132(a)(1)(B), "[a] civil action may be brought (1) by a participant or beneficiary ... (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." The Supreme Court has found that the text of § 1132(a)(1)(B) does not allow courts to enforce the terms of a plan summary furnished by a plan administrator, because § 1132(a)(1)(B) only authorizes enforcement of the "terms of the plan." *CIGNA Corp. v. Amara*, --- U.S. ---,131 S.Ct. 1866, 1878, 179 L.Ed. 2d 842 (2011). As such, plan summaries provide communication with beneficiaries about the plan, but their statements do not themselves constitute the terms of the plan. *Id.* Admittedly, in this case, we do not have a "plan summary" that contradicts the Policy – the plan summary itself was the Certificate that Kanawha alleges Gilchrist gave to its employees, but the plaintiffs assert Mr. Simon never received. Instead, the court is faced with a website that the plan administrator, Gilchrist, set up so that employees could elect benefits. This website thus falls into a vague "other" category, somewhere in the ether between plan summary documents and the Policy itself. The undersigned finds it sufficient for this inquiry, however, that the website itself is not the Policy, and because § 1132(a)(1)(B) only authorizes enforcement of the plan itself (here, the terms of the Policy), the plaintiffs cannot pursue their claims for relief under § 1132(a)(1)(B).

If the plaintiffs are not proceeding under § 1132(a)(1)(B), then what provision are they proceeding under instead? The plaintiffs argue that their claims actually fall under the equitable "catchall" relief of § 1132(a)(3). They cite the Fifth Circuit cases *Varity Corp. v. Howe*, 516 U.S.

489 (1996), and *Musmeci v. Schweggman Giant Supermarkets, Inc.*, 332 F.3d 339 (5th Cir. 1999), two cases in which the courts allowed plaintiffs to pursue "equitable relief" under ERISA § 1132(a)(3) in situations where a straightforward claim for benefits under § 1132(a)(1)(B) would not make the claimants whole.

In a previous ruling on Gilchrist's Motion for Judgment on the Pleadings, this court noted that *Varity* and its ilk were distinguishable from this case. In *Varity*, for example, the plaintiffs were asking for equitable relief because they were asking for *reinstatement* of their welfare benefit plans – i.e., the plaintiffs were asking for the equitable "taking back" of benefits they had earned but had been repossessed by the defendants. *Varity*, 516 U.S. at 489. This court, in its previous ruling, relied on the Fifth Circuit's *Amschwand v. Spherion Corp.*, 505 F.3d 342 (5th Cir. 2007), *overruled by Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448 (5th Cir. 2013), to find that it was clear that since the plaintiffs were not asking for the return of ill-gotten proceeds, but were instead asserting damages because of the defendants' alleged breaches, this sounded in legal damages, not equity.[20] This court concluded that, in light of *Amschwand*, the only "equitable" relief the plaintiffs could seek would be the return of the amount Mr. Simon overpaid in premiums, as this would constitute an equitable "taking back" of proceeds currently in the possession of the defendants.[21]

In the interim between this court's ruling and this decision, however, the Fifth Circuit handed down *Gearlds v. Entergy Servs., Inc.*, which overruled the *Amschwand* line of cases. *Gearlds*, 709 F.3d at 452. The *Gearlds* decision seriously places in doubt whether the

---

[20]Mem. Ruling on Mot. for J. on the Pleadings, [Doc. 38] at p. 23.

[21] *Id.* at pp. 23 – 24. In the opinion, the plaintiffs were granted leave to amend their complaint to more properly set forth their equitable claims. The plaintiffs filed a Motion to Amend/ Correct with Magistrate Judge Kay and, after extensive briefing, Judge Kay granted the plaintiffs' motion on March 19, 2013.

undersigned's previous ruling on the Motion for Judgment on the Pleadings is still on firm ground. In *Gearlds*, the Fifth Circuit noted that while it had been the trend in this circuit and other circuits that "'other appropriate equitable relief' was limited to the kinds of remedies typically available at equity, such as injunctions, mandamus, or restitution, and that so-called 'make-whole' monetary damages were not within the scope of the statute," the Supreme Court had called this into question in its recent decision, *CIGNA Corp. v. Amara*. *Id.* at 450.

In *Amara*, a group of employees sued their employer and their pension plan because the employer misled the employees about the conversion of a defined benefit retirement plan into a cash benefit plan with less generous benefits. *Amara*, 131 S.Ct. at 1870. At the district court level, the court found that the defendant had intentionally misled the employees, and it reformed the terms of the plan, requiring the plan administrator to pay to the already retired beneficiaries money owed to them under the plan as reformed. *Id.* at 1874 – 75, 1880. The Supreme Court held that § 1132(a)(1)(B) did not authorize this relief, because that section did not allow for reformation of the plan. *Id.* at 1876 – 77. It did find, however, that relief might be available under § 1132(a)(3), because even though the district court's remedy was in the form of money damages, this was not beyond the scope of equity since "[e]quity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." *Id.* at 1880. The Court noted this relief was commonly known as "surcharge," and found that it was "critical" that the defendant's position as a fiduciary was analogous to a trustee, thus concluding that "an award of make-whole relief" in the form of surcharge was within the scope of "appropriate equitable relief" for purposes of § 1132(a)(3). *Id.* The Court also noted that the equitable theory of estoppel was also available to parties proceeding under § 1132(a)(3). *Id.* at 1881.

9

The *Gearlds* court also found persuasive the reasoning from the Fourth Circuit's *McCravy v. Metropolitan Life Ins. Co.*, 690 F.3d 176 (4th Cir. 2012), one of the first (and only) circuit decisions addressing equitable relief in the aftermath of *Amara*.  In *McCravy*, the plaintiff paid life insurance premiums for several years on her dependent daughter, only to learn at her daughter's death that she had been ineligible for dependent coverage.  *McCravy*, 690 F.3d at 178.  The plan denied the plaintiff's request for benefits and instead offered to refund the premiums to her.  *Id.*  The plaintiff sued for breach of fiduciary duty, alleging that the insurance company had represented to her for years that her daughter was covered by the dependent life insurance, and that as a result, she had not shopped around elsewhere for life insurance for her daughter.  *Id.*  She sought the amount of life insurance proceeds lost because of the insurance company's alleged breach.  *Id.* at 181.  Construing *Amara*, the Fourth Circuit found that because a monetary "make-whole" remedy might be available under § 1132(a)(3), the plaintiff's relief was not limited to a refund of the premiums.  *Id.*  The Fourth Circuit then remanded the case to the district court to determine whether, based on the merits, the breach of fiduciary claim would succeed on the merits and whether surcharge was available.  *Id.* at 181 – 82.

Following the lead of *Amara* and *McCravvy*, the Fifth Circuit *Gearlds* court found that the *Amschwand* decision had been implicitly overruled.  *Gearlds*, 709 F.3d at 452.  The Fifth Circuit then decided whether the "surcharge" remedy was applicable to the *Gearlds* facts.  *Id.*  In *Gearlds*, an employee retired early, allegedly relying on written and oral assurances from his employer that he would continue to receive medical benefits.  *Id.* at 449.  Five years later, the employer notified the employee that it was discontinuing his benefits, and thus the employee filed suit, alleging a breach of fiduciary duty under § 1132(a)(3) and equitable estoppel.  *Id.* at 449 – 50. Finding that the employee had an actionable claim for "surcharge," the Fifth Circuit noted:

10

> To be sure, [the employee] did not expressly plead or argue "surcharge," but he did argue that he should be made whole in the form of compensation for lost benefits, and his complaint specifically asked for "[a]ny and all other damages and/or relief, equitable or otherwise, to which [he] may be entitled under federal law." Courts must focus on the substance of the relief sought and the allegations pleaded, not on the label used. *See Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir.1996) (en banc) ("[W]e have oft stated that 'the relief sought, that to be granted, or within the power of the Court to grant, should be determined by substance, not a label.' " (citation omitted)). We conclude that [the employee] has at least stated a plausible claim for relief, and therefore further proceedings are required. We leave to the district court the determination whether [the employee's] breach of fiduciary duty claim may prevail on the merits and whether the circumstances of the case warrant the relief of surcharge.

*Id.* at 452.

In light of the *Gearlds*, *McCravy*, and *Amara* decisions, the undersigned cannot say that "surcharge" is certainly not available to the plaintiffs under § 1132(a)(3). Like in *Gearlds*, while the plaintiffs did not plead "surcharge," their complaint does request both legal and equitable relief against the defendants because of misleading information that differed from the terms of the Policy.

The plaintiffs also asserted a "detrimental reliance" or, in other words, equitable estoppel claim against the defendants, asserting that Mr. Simon relied to his detriment on the misleading information from the Gilchrist website, when he could have instead bought different insurance from another provider if he had known the real facts. The *Gearlds* court, following the lead of the *Amara* court, implicitly indicates that a claim for equitable estoppel is also available under § 1132(a)(3). In *Gearlds*, after finding that *Amara* allowed the plaintiffs to purchase a surcharge claim, the Fifth Circuit noted that the plaintiffs had also sought the remedy of equitable estoppel, but that the district court had dismissed this claim because "extraordinary circumstances" were not present. *Id.* at 453. Because the *Gearlds* court found that the plaintiffs had stated a viable claim for surcharge based on the *Amara* decision, the court did not address the merits of the

11

equitable estoppel claim, but it did note that the district court was free to consider that claim on remand. *Id.*

In light of all this, it appears that, at the very least, the plaintiffs have possible surcharge and equitable estoppel claims against the defendants under § 1132(a)(3).  A claim similar to the plaintiffs' contract ratification claim (that the defendants "ratified" the Gilchrist website election amounts by taking Mr. Simon's premiums for a year, and thus these terms control over the Policy terms), is not addressed in *Amara* or *Gearlds*, but it appears that, if ERISA does allow such a claim, it would also fall under § 1132(a)(3) as well.  This is so because the contract ratification claim also deals with the enforcement of terms that are not in the actual Policy.  Thus, having found that these claims fall under § 1132(a)(3), the inquiry becomes, what discovery is allowed in a case that does not address a straightforward claim for benefits under § 1132(a)(1)(B), but instead addresses a claim for equitable relief under § 1132(a)(3)?

It appears that the Fifth Circuit has not directly addressed what the scope of discovery is in an ERISA § 1132(a)(3) case.  Indeed, while some district courts in the Fifth Circuit have allowed discovery to proceed in a case that may include an § 1132(a)(3) claim, they do not express the exact scope of said discovery.  *See, e.g., Gonzalez v. Autozoners, LLC,* no. 4:09-4054, 2012 WL 3069841 (S.D. Tex., July 27, 2012) (noting that, after a motion to dismiss a plaintiff's § 1132(a)(3) claim was denied, the parties were allowed to proceed with discovery); *Powell v. Eustis Engineering Co.,* no. Civ.A. 02-1259, 2003 WL 22533650 (E.D. La., Nov. 6, 2003) (denying a defendants' motion to dismiss and finding that discovery was necessary to ascertain whether the plaintiff's § 1132(a)(3) claim for breach of fiduciary duty was superfluous or duplicative of the plaintiffs' § 1132(a)(1)(B) claim for benefits).

A few district courts in other circuits have squarely addressed this issue, however.  For example, in *Jensen v. Solvay Chemicals, Inc.*, 520 F.Supp. 2d 1349 (D. Wyo. 2007), a district court addressed whether a magistrate judge had properly limited discovery in a case where the plaintiff had plead an § 1132(a)(3) claim.  Relying on an opinion from the Tenth Circuit (*Hall v. Unum Life Ins. Comp. of Am.*, 300 F.3d 1197 (2002)), the magistrate judge had found that "in ERISA cases, 'judicial review is not allowed, except in unusual circumstances.'"  *Id.* at 1352.  The district court reversed this finding, holding that while discovery was limited in § 1132(a)(1)(B) cases,

> [c]ase law does not constrain discovery under ERISA [§ 1132(a)(3)] actions. *Id.* The limited discovery ordered by [the magistrate judge] and proscribed by *Hall* is limited to claims arising under ERISA [§ 1132(a)(1)(B)]. *Id.* This is logical as these actions do not benefit from the administrative process. Courts are not required to give deference to plan committees or fiduciaries in [§ 1132(a)(3)] actions and therefore limitations to the administrative record are not required. *Id.* Section [1132(a)(3)] actions are to enforce rights not arising under ERISA plans, but rather arising from ERISA itself. *Id.* Therefore, a finding that claims arise from ERISA [§ 1132(a)(3)] reverts discovery into the traditional realm and is governed under traditional federal, circuit, and local procedure. *Id.*

Many other district courts have followed this trend.  *See, e.g., Manieri v. Bd. of Trustees of Operating Engineer's Local 825 Pension Fund*, no. 07-1133, 2008 WL 4224924 (D. N.J., Sept. 10, 2008) (holding that discovery would be allowed in a case that included a § 1132(a)(3) claim); *see also Jackson v. Rohm & Haas Co.*, No. 05-4988, 2007 WL 2916396, at *1 (E.D. Pa. Oct 1, 2007) (finding that discovery is only limited to the administrative record in denial of benefits cases and not those claiming breach of fiduciary duty); *Kulkarni v. Metropolitan Life Ins. Co.*, 187 F.Supp. 2d 724, 728 (W.D. Ky. 2001) (allowing for additional discovery in ERISA breach of fiduciary duty action).

13

While case law from sister circuits is not binding on this court, the undersigned finds the reasoning in these cases persuasive in the absence of explicit guidance from the Fifth Circuit. Here, Kanawha's decision to deny benefits was not based on an interpretation of the Policy terms to determine whether the beneficiaries were entitled to benefits. Instead, reading the Policy terms in a straightforward manner, Kanawha found that Mr. Simon could only elect up to $300,000 in benefits, and awarded the plaintiffs this amount. There is no traditional "administrative record" in this case like there is an a traditional § 1132(a)(1)(B) case, and indeed the plaintiffs were not moved through an administrative process or allowed to appeal the decision as they normally would in such a case. The dispute in this case does not center around how Kanawha interpreted the Policy, but instead centers around materials *outside* of the Policy and *outside* of the administrative review process. Limiting the parties' ability to conduct discovery to the same extent that parties are limited in § 1132(a)(1)(B) actions would thus preclude the plaintiffs in particular from obtaining evidence necessary to defend against a motion for summary judgment. But, before finding that the parties are allowed the full scope of traditional discovery, the undersigned must turn to Kanawha's next argument: that discovery would be futile because, in this instance, it would not affect the ultimate outcome of its Motion for Summary Judgment.

## B.  Futility of Further Discovery

Kanawha next argues that discovery should not proceed, because the main evidence that the plaintiffs seek is whether Mr. Simon ever received the Policy documents, and that the case law is clear that even when a plaintiff does not know what the true terms of the plan are, he cannot pursue a claim for benefits in excess of those offered in the clear plan terms. The Fifth Circuit case *Washington v. Allstate Ins. Co.*, 901 F.2d 1281 (5th Cir. 1990), succinctly explains

14

situations in which a court may deny discovery because it would not change the outcome of a

pending motion for summary judgment:

> This court has long recognized that a plaintiff's entitlement to discovery prior to a ruling on a motion for summary judgment is not unlimited, and may be cut off when the record shows that the requested discovery is not likely to produce the facts needed by the plaintiff to withstand a motion for summary judgment. *Paul Kadair, Inc. v. Sony Corp. of America,* 694 F.2d 1017, 1029–30 (5th Cir.1983). *See Fisher v. Metropolitan Life Insurance Co.,* 895 F.2d 1073 (5th Cir.1990) and *Netto v. Amtrak,* 863 F.2d 1210, 1216 (5th Cir.1989).

> Rule 56(f) provides:

> > Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

> The protection afforded by Rule 56(f) is an alternative to a response in opposition to summary judgment under Rule 56(e) and is designed to safeguard against a premature or improvident grant of summary judgment. 10A Wright, Miller, and Kane, *Federal Practice and Procedure* § 2740 (1983).

*Id.* at 1285.

In support of their argument that the plaintiffs' claims are all futile, Kanawha first cites a

Louisiana Third Circuit case, *Credeur v. Continental Assurance Co.,* to support its argument that,

even without knowledge of what the actual Policy contained, Mr. Simon does not have viable

claims against Kanawha.  While this case does discuss a claim for benefits under a life insurance

policy, the undersigned notes that the *Credeur* court was construing Louisiana law, not ERISA, in

making its determination. *See generally Creuder,* 520 So.2d 214.  Thus, the undersigned rejects

the argument that this decision is persuasive or controlling on the inquiry in this case.  The

undersigned will next turn to each of the plaintiffs' possible claims to ascertain whether additional discovery would be futile, based on the existing evidence before the court.

### 1. Detrimental Reliance/Estoppel Claim

The undersigned will first assess whether additional discovery is necessary on the plaintiffs' detrimental reliance/estoppel claim. As noted *supra*, the plaintiffs argue in their complaint that Mr. Simon relied to his detriment on the incorrect information on the Gilchrist website, and that he might have shopped for other insurance if he had known what the actual Policy limits were. In support of its argument, Kanawha cites in its Motion to Continue Discovery opposition brief and its Motion for Summary Judgment brief an Eastern District of Michigan case, *O'Connor v. Provident Life & Accident Co.* In *O'Connor*, the plaintiff, Mrs. O'Connor, filed suit against Provident Life and Accident Company to recover unpaid proceeds from her late husband's life insurance policy. *O'Connor*, 455 F.Supp. 2d at 671. Just like in this case, her late husband had obtained his life insurance policy (which included a death benefit that would be calculated as five times his annual salary) through his employer, with Provident as the insurance underwriter. *Id.* Mr. O'Connor elected a death benefit of $273,000, which was in excess of the death benefit he could actually receive based on his annual salary ($120,000). *Id.* When Mr. O'Connor died, therefore, Provident paid a death benefit based on the maximum amount he could elect according to his annual salary. *Id.*

Mrs. O'Connor then filed suit, claiming the difference between the amount paid and the amount her husband had elected ($153,000), and arguing that Provident either waived its approval requirements or was equitably estopped from denying coverage. *Id.* The *O'Connor* court analyzed the plaintiff's claims under the Sixth Circuit's equitable estoppel test, which required that

16

. . . (1) there must be conduct or language amounting to a representation of material fact; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must intend that the representation be acted on, or the party asserting the estoppel must reasonably believe that the party to be estopped so intends; (4) the party asserting the estoppel must be unaware of the true facts; and (5) the party asserting the estoppel must reasonably or justifiably rely on the representation to his detriment.

*Id.* at 679 (citing *Moore v. LaFayette Life Ins. Co.,* 458 F.3d 416, 428 – 29 (6th Cir. 2006)). The

*O'Connor* court found that because the administrative record did not demonstrate that the

defendant was aware of the true facts, it intended that the plaintiff act on the misrepresentation, or

that the plaintiff justifiably relied on the misrepresentation to her detriment. *Id.* As such, the

plaintiff did not have a viable equitable estoppel claim. *See id.*

While the *O'Connor* court may have correctly cited the equitable estoppel test for ERISA

cases in the Sixth Circuit, a review of Fifth Circuit case law indicates that the test for estoppel is

slightly different in this circuit, and thus ultimately *O'Connor*'s persuasiveness is quite limited.

Instructive to the court on this issue is the Fifth Circuit case *Mello v. Sara Lee Corp.*, 431 F.3d

440 (5th Cir. 2005). In *Mello*, the employee-plaintiff brought suit against his employer, pension

plan, and the plan's trustee after they allegedly wrongfully denied him pension plan benefits.

*Mello*, 431 F.3d at 442. The employee argued that he had relied to his detriment on oral

assurances of a company executive and non-binding monthly pension statements to determine the

value of his pension. *Id.* The district court found that his employer was estopped from correcting

the clerical error that reduced the amount of his expected benefits significantly, but on appeal, the

Fifth Circuit reversed. *Id.*

The Fifth Circuit first noted that it would follow the other circuits in "explicitly adopting

ERISA-estoppel as a cognizable legal theory." *Id.* at 444. Under ERISA estoppel, a plaintiff is

required to establish: (1) a material misrepresentation; (2) reasonable and detrimental reliance

upon the representation; and, (3) extraordinary circumstances. *Id.* at 444 – 45. Applying the law to the facts, the *Mello* court found that the material misrepresentation prong was met, as "material misrepresentations can be made in informal documents." *Id.* at 445.

Turning to the reasonable and detrimental reliance prong, however, the court found that it was unreasonable for the employee to rely on the employer's informal material misrepresentations regarding his benefits. *Id.* at 445. The *Mello* plaintiff argued that it was reasonable for him to rely on oral and written representations extraneous to the plan terms rather than the unambiguous terms in the plan. *Id.* Essentially, the plaintiff argued that the informal written and oral statements modified the plan. *Id.* at 445 – 46. The *Mello* court rejected this argument, citing the "clear and consistent case law forbidding recognizing reasonable reliance on informal documents in the face of unambiguous plan terms." *See id.* at 447 (quoting *In re Unisys Corp. Retiree Med. Benefit ERISA Litig.*, 58 F.3d 896, 908 (3d Cir.1995) ("Because our decisions require that any detrimental reliance on plan language also be 'reasonable,' our finding that the [terms of the Plan] are unambiguous undercuts the reasonableness of any detrimental reliance ...."); *see also Sprague v. GMC*, 133 F.3d 388, 404 (6th Cir.1998) (noting that a "party's reliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents available to or furnished to the party").

While the *Mello* court did not proceed to the extraordinary circumstances prong, another Fifth Circuit case, *High v. E-Systems, Inc.*, 459 F.3d 573 (5th Cir. 2006), cited language from the Third Circuit's *Curico v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226 (3d Cir. 1994) decision as examples of extraordinary circumstances in an estoppel case:

> We have not specifically defined this term, rather we rely on caselaw to establish its parameters. In *Rosen v. Hotel and Restaurant Employees and Bartender's Union*, 637 F.2d 592 (3d Cir.1981), we found that extraordinary circumstances

existed when the trustee of a pension fund advised Rosen that his pension was in jeopardy due to his employer's failure to make payments to the fund, allowed Rosen to write out a check for the remainder of the employer's debt, and deposited the check. *Id.* at 598. We held that the trustee was then estopped from asserting that Rosen's payment did not entitle him to his pension. *Id.* By contrast, in *Gridley v. Cleveland Pneumatic Co.,* 924 F.2d 1310 (3d Cir.1991), Gridley, while continually and totally disabled in the hospital, increased his life insurance coverage under a plan that specifically required active, full-time status for such an increase. Although the employer deducted additional amounts from his salary to cover the increase, we found that extraordinary circumstances did not exist when the insurance carrier refused the additional amount. *Id.* at 1319 (citing *Hozier v. Midwest Fasteners Inc.,* 908 F.2d 1155, 1165 n. 10 (3d Cir.1990)).... [In this case,] we have another hospital misrepresenting the type of coverage for which recipients could enroll. Capital Health compounded its error by reassuring Mrs. Curcio that she was covered in the amount of $400,000 after the accidental death of her husband.... Although it was not in Capital Health's control, John Hancock contributed to the anguish by first confirming the coverage Mrs. Curcio expected and then disclaiming that such protection would be forthcoming. The roller coaster did not stop there. Capital Health supported Mrs. Curcio's claim to the point of encouraging her to file suit, even offering to pay her legal fees. It retained outside counsel to review the matter and offered [its] services to her without charge.... Somewhere along the way Capital Health had a change of heart.... These events in our view are demonstrative of extraordinary circumstances.

*High v. E-Sys. Inc.*, 459 F.3d at 580, n. 3 (citing *Curico*, 33 F.3d at 237 – 38).

Based on the case law above, the undersigned expresses doubts that discovery would be entirely futile to the estoppel/detrimental reliance claim. *Mello* indicates that it is unreasonable for a plaintiff to rely on extraneous information that differs from the clear terms of the plan when the plaintiff has knowledge of what the clear plan terms are. *Mello,* 431 F.3d at 445. It is uncertain whether the *Mello* court would have found it unreasonable for Mr. Simon to rely on the Gilchrist website, particularly if the plaintiffs are correct in guessing that Mr. Simon might not have been provided with a Certificate that explained the Policy terms. Further, problems abound with whether the evidence is sufficient to address the "extraordinary circumstances" prong of the *Mello* test. All the evidence that the plaintiffs currently have is a February 3, 2011 letter from

Kanawha, explaining the payout of benefits under Mr. Simon's plan;[22] copies of checks from Kanawha for the payout of Mr. Simon's policy;[23] letters from Kanawha's attorneys at Baker Donelson;[24] a copy of the Certificate; and, a copy of the Policy.[25] The undersigned cannot say that this evidence alone is sufficient for the parties to prove or disprove the estoppel claim, particularly when Kanawha controls access to much of the evidence the plaintiffs seek, and the plaintiffs are uncertain about what evidence Kanawha has. In the interest of justice, discovery must be allowed to flesh out this claim, and thus summary judgment is premature on this issue.

### 2. Surcharge

Next, the court will ascertain whether the court requires additional evidence that the plaintiffs might obtain through discovery for a surcharge claim. The *Amara* Court provided a rather vague description of what a plaintiff might have to show for a surcharge claim:

> . . . Nor did equity courts insist upon a showing of detrimental reliance in cases where they ordered "surcharge." Rather, they simply ordered a trust or beneficiary made whole following a trustee's breach of trust. In such instances equity courts would "mold the relief to protect the rights of the beneficiary according to the situation involved." Bogert § 861, at 4. This flexible approach belies a strict requirement of "detrimental reliance."
>
> To be sure, just as a court of equity would not surcharge a trustee for a nonexistent harm, 4 Scott & Ascher § 24.9, a fiduciary can be surcharged under § 502(a)(3) only upon a showing of actual harm—proved (under the default rule for civil cases) by a preponderance of the evidence. That actual harm may sometimes consist of detrimental reliance, but it might also come from the loss of a right protected by ERISA or its trust-law antecedents. In the present case, it is not difficult to imagine how the failure to provide proper summary information, in violation of the statute, injured employees even if they did not themselves act in

---

[22] "Feb. 3, 2011 Letter from Kanawha," Ex. to Carmen Marlbrough's Aff. for Pls.' Mot. to Continue Mot. for Summ. J., [Doc. 27-3] at pp. 4 – 5.

[23] "Checks from Kanawha to Carmen Marlbrough," *id.* at pp. 6 – 10.

[24] "Letters from Baker Donelson," *id.* at pp. 11 – 14.

[25] "Certificate and Policy," Ex. 2 to Pls.' Mot. to Continue Mot. for Summ. J., [Doc. 27-4].

> reliance on summary documents—which they might not themselves have seen—
> for they may have thought fellow employees, or informal workplace discussion,
> would have let them know if, say, plan changes would likely prove harmful. We
> doubt that Congress would have wanted to bar those employees from relief.

*Amara*, 131 S.Ct. at 1881.

While the Fifth Circuit has not yet established the specific elements of a surcharge claim

under § 1132(a)(3), the Ninth Circuit, in *Skinner v. Northrop Grumman Retirement Plan B*, 673

F.3d 1162 (9th Cir. 2012) provides some guidance.  In *Skinner*, the plaintiffs (insureds under their

employer's retirement plan) were provided pension calculation packets.  *Skinner*, 673 F.3d at

1164.  The plaintiffs filed suit after they realized that the information on calculation of pensions in

their packets differed from the information on calculation of pensions in the plan master

documents which were actually being enforced by the administrators.  *Id.* at 1164.  The Ninth

Circuit held that, based on *Amara*, a plaintiff might have an actionable claim against an insurer

for failing to provide summary plan documents that were "sufficiently accurate and

comprehensive to reasonably apprise" the plaintiffs of their rights and obligations under the plan.

*Id.* at 1167.  Under this theory of breach, the Ninth Circuit held that the plaintiffs either had to

prove unjust enrichment or harm caused as a result of the breach.  Addressing the unjust

enrichment argument, the Ninth Circuit noted:

> A trustee (or a fiduciary) who gains a benefit by breaching his or her duty must
> return that benefit to the beneficiary. Restatement (Third) Trusts § 100(b) (2012);
> Restatement (Second) Trusts § 205 (1959); Restatement (Third) Restitution &
> Unjust Enrichment § 43 (2011); Restatement (First) Restitution § 138 (1937). In
> this case, Appellants have presented no evidence that the committee gained a
> benefit by failing to ensure that participants received an accurate [pension
> calculation packet].

Turning to the harm theory, the Ninth Circuit found:

A trustee who breaches his or her duty could be liable for loss of value to the trust or for any profits that the trust would have accrued in the absence of the breach. RESTATEMENT (THIRD) TRUSTS § 100(a) (2012); RESTATEMENT (SECOND) TRUSTS § 205 (1959). The beneficiary can pursue the remedy that will put the beneficiary in the position he or she would have attained but for the trustee's breach.

Appellants seek compensatory relief. But considering that Appellants did not rely on the inaccurate [pension calculation packet], they establish no harm for which they should be compensated.

Appellants argue that the "harm" of being deprived of their statutory right to an accurate [pension calculation packet] is a compensable harm, but we disagree. Appellants' interpretation would render the advisory committee strictly liable for every mistake in summary documents. In sum, Appellants have not shown that their current positions are any different than they would have been without the inaccurate [pension calculation packet].

*Id.* at

Turning to this case, the plaintiffs do have a claim for unjust enrichment: they argue that, because of the erroneous information on the Gilchrist website, Kanawha gained a benefit in the form of Mr. Simon's overpaid premiums for a year.  Additionally, the plaintiffs can assert actual harm: both they and Mr. Simon expected that Mr. Simon's benefits totaled $700,000, when they instead only totaled $300,000.  Both of these findings indicate that discovery would not be futile. Further, as the elements of a surcharge claim are not clearly defined yet in this circuit, particularly because of the recentness of *Amara*, the undersigned finds that erring on the side of caution and allowing the record to develop on this issue would be appropriate.

### 3. Ratification/Waiver Claim

The court next turns to the plaintiffs' ratification claim: that the defendants "ratified" (or, in other words, waived) Mr. Simon's $700,000 election because they accepted Mr. Simon's premiums for a year and never voided the election during his lifetime.  The undersigned notes that neither *Amara* nor *Gearlds* make it clear whether a ratification or waiver is actionable under §

1132(a)(3). Assuming *arguendo* that it is, however, the court will examine the relevant case law and evidence to see if further discovery is necessary on this claim.

Kanawha once again relies on the Michigan *O'Connor* case in support of its argument on that the plaintiffs do not have a valid ratification/waiver argument. In Mrs. O'Connor's waiver argument, she alleged that because Provident, the defendant insurance company, never double-checked to make sure Mr. O'Connor could elect an excess benefit amount, Provident had waived any requirements that Mr. O'Connor had to offer proof that he could elect an excess benefit amount. 455 F.Supp. 2d at 676. The *O'Connor* court reviewed circuit court case law (including a Fifth Circuit case, *Pitts v. American Sec. Life Ins. Co.*, 931 F.2d 351 (5th Cir. 1991)), and noted that the case law showed that "the party seeking to benefit from the waiver requirement [must] prove that the other party was aware of the facts and chose not to assert the ineligibility at the time the premiums were accepted." *Id.* at 678. The court held that it was clear, based on the policy documents, that an employee was only allowed to elect up to five times his annual salary in benefits, and that Provident was not aware that Mr. O'Connor had applied for coverage that exceeded those limits. *Id.* It noted that instead, it was possible that the employer had made a mistake in deducting premiums from his paycheck without receiving approval, or else the defendant had forgotten to insist on evidence of insurability above the maximum allowed amount. *Id.* Either way,

> there [was] no evidence that [the defendant] was aware of the amount of Mr. O'Connor's annual earnings and [it] therefore could not know the amount of coverage he elected exceeded five times those earnings. A receipt of premiums without explanation from the employer . . . may have appeared to [the defendant] as a part of the normal receipts of the group life insurance policy. There is no evidence that [the defendant] was attempting to reap an unjust benefit by extracting premiums from [the plaintiff's father] when it knew it had a defense to coverage and waited until a claim was made before cancelling the excess coverage amount.

23

*Id.*

Like in the *O'Connor* case, the plaintiffs make a similar waiver argument (which they refer to as a "ratification" argument). They rely on the Fifth Circuit case *Wamsley v. Champlin Ref. & Chemicals, Inc.*, 11 F.3d 534 (5th Cir. 1993). In *Wamsley*, terminated employees received termination benefits after signing a release form which provided that, by accepting the benefits, the plaintiffs would not later file employment discrimination suits. *Wamsley*, 11 F.3d at 536 – 37. The terminated employees later tried to sue their former employer for discrimination, after finding out the release forms might not have been valid. *Id.* at 537. The Fifth Circuit, agreeing with the district court, found that the plaintiffs could not pursue their discrimination claims because they had "ratified the [release] agreements by failing to return to [their former employer] the benefits they had received as consideration after learning of the releases' alleged invalidity." *Id.*

The Fifth Circuit's *Pitts* case provides a more similar fact pattern to the one in this case than *Wamsley*, as *Pitts* involves the actions of the insurer as opposed to the insured. In *Pitts*, a plaintiff was insured under a group health policy that required the group to have at least ten members. *Pitts*, 931 F.2d at 353. Because the plaintiff's business was having difficulty, a large number of employees left, until the plaintiff was the only insured remaining under the policy. *Id.* at 354. When the plaintiff became very ill, the insurance company paid his medical expenses, despite knowing that the group health policy was void because it no longer had at least ten members. *Id.* In finding for the plaintiff, the Fifth Circuit noted that "waiver is the voluntary or intentional relinquishment of a known right." *Id.* at 356. Accordingly, it held that because the insurance company had continued to accept premiums and pay medical expenses, even after it

24

knew about the diminished group size, it had waived its right to assert that the policy was void because it had too few insureds. *See id.*

What these cases all show is that a ratification/waiver claim turns on whether the defendants knew that Mr. Simon was electing too much in insurance premiums. While Gilchrist may have had direct knowledge that Mr. Simon had elected over his limit in benefits, because it set up the website Mr. Simon used and collected his individual premiums before sending them off with the rest of the premiums in a lump sum to Kanawha, it is uncertain whether Kanawha had knowledge that Mr. Simon had elected premiums over his limit. Evidence that might shed light on this issue, such as whether Gilchrist shared with Kanawha the records generated from the website, would be one type of evidence that might have put Kanawha on notice that Mr. Simon was electing too much in benefits. As mentioned *supra*, however, no such evidence exists: the undersigned is essentially relegated to sifting through the Policy, the Certificate, and limited correspondence between Kanawha and the plaintiffs. The undersigned certainly cannot say that Kanawha definitely does or does not have records from Gilchrist that would put Kanawha on notice that Mr. Simon had elected excess benefits. But, as the very least, the plaintiffs should be given a chance, through discovery, to ascertain whether such evidence exists. Accordingly, granting summary judgment on the contract ratification claim is also premature, and discovery must go forward so that the plaintiffs can flesh out this claim.

## CONCLUSION

Because this court has found that this case involves claims for relief under ERISA § 1132(a)(3), and that § 1132(a)(3) does not have the same stringent discovery limits as ERISA § 1132(a)(1)(B) cases, the court orders that the parties proceed with discovery. The parties are to contact Magistrate Judge Kay's chambers within ten (10) days of the issuance of this ruling in

order to set a discovery schedule and other deadlines.  Additionally, because the undersigned

disagrees with Kanawha that the additional evidence the plaintiff seek would not affect the

viability of their claims, the court dismisses the pending Motion for Summary Judgment as

premature.  The defendants may file a renewed Motion for Summary Judgment after the parties

have been given a chance to conduct discovery.

     Lake Charles, Louisiana, this _29_ day of _April_, 2013.

                                    PATRICIA MINALDI
                                    UNITED STATES DISTRICT JUDGE